IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUE YANG, | Case No. 08-cv-00265-AWI-JLT |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS ON PLAINTIFF'S APPEAL FROM ADMINISTRATIVE DECISION |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | 14-DAY DEADLINE TO FILE OBJECTIONS |
| Defendant. / | |

**BACKGROUND**

Plaintiff Sue K. Yang ("Claimant" or "Plaintiff") seeks judicial review of an administrative decision denying her claim for disability insurance benefits ("DIB") under Title II and supplemental security income benefits under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. Pending before the Court is Plaintiff's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner"). On February 20, 2008, Plaintiff's complaint was filed in the United States District Court for the Eastern District of California. (Doc. 1).

Plaintiff filed his opening brief on August 24, 2009. (Doc. 19). The Commissioner filed his opposition brief on September 23, 2009. (Doc. 20). Plaintiff filed a reply brief on October 8, 2009. (Doc. 21).

**FACTS AND PRIOR PROCEEDINGS**[1]

On February 25, 2005, Plaintiff filed applications for disability insurance and supplemental security income benefits under Titles II and XVI of the Social Security Act ("Act"). Plaintiff alleged that he had been under a disability since May 1, 2002, due to disabling physical and mental problems. After initial denial of his request for benefits by the Agency, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On April 30, 2007, ALJ James P. Berry held a hearing, and on June 14, 2007, denied benefits. Id. at 11-25. Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Id. at 25. The Appeals Council denied review on December 19, 2007. Id. at 1-4.

Hearing Testimony

On April 30, 2007, a hearing was held before the ALJ. AR 40-64. Plaintiff and his attorney, Jeffrey Milam, appeared at the hearing. Id. at 40.

Plaintiff testified he was born in Laos, where he was a "soldier" and had a limited education. AR 46. He testified that he immigrated to the U.S. and became a naturalized citizen in the 1990s. Id. at 53. He reported that he did not speak English nor could he read or comprehend English. Id. at 46. Plaintiff testified that he was married and lived with his wife and son. Id. at 45. His wife worked full-time. Id.

Plaintiff described numerous physical and mental problems. He had a driver's license but in the weeks prior to the hearing stopped driving because he felt shaky. AR 46. In particular, his reported that his right hand was shaky. Id. He claimed that he had heart by-pass surgery[2] and that after this surgery, his hand became shaky. Id.

Plaintiff reported that coughed due to asthma which he stated had been a problem going back to 2005. AR 47. He had also suffered since at least that time from high blood pressure and diabetes. Id. He described weak leg strength and dizziness which he claimed, along with his heart problems,

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[2] Review of the record show that Plaintiff has not had a by-pass operation. Rather, Plaintiff was treated for two blocked coronary arteries by stent in January, 2007. AR 398.

had prevented him from working. Id. at 47-48.

Plaintiff testified that he suffered from and had been treated for stress and depression. AR 47-48, 49. He reported that he stopped that treatment after his surgery because he felt too weak to continue with it. Id. at 48. Also, he described back pain and stated he suffered from arthritis in his right knee, back and hip. Id. at 52. He reported that he suffered tingling in his leg and hand that his doctor told him might be due to his high blood pressure or diabetes. Id. at 51.

Plaintiff testified that he suffered from poor vision, particularly in his right eye. AR 52. He was prescribed glasses but stated they help only a little. Id. at 54. The said that the glasses fall off when he gets shaky. Id. Plaintiff reported that he took medications for his problems and stated they were helpful and that he suffered no side effects due to their usage. Id.

As a result of his maladies, Plaintiff stated that he suffered from dizziness which made him feel like he may fall. AR 51. For several years he reported that he had not been able to stand for more than 10 minutes at a time. Id. at 49. He asserted that he could not do anything around the house. Id. at 50-51. He stated that he couldn't lie down for more than a few hours and he can't sleep. Id. at 50. Since 2005 or 2006, he has been unable to sit for more than 1-2 hours at a time. Id. He as not been able since that time to lift more than 10 pounds. Id. He also suffers from forgetfulness which has made it difficult for him to do his former work. Id. at 48.

Plaintiff testified that had needed to use a cane constantly for the two years proceeding the hearing. AR 45-46. In the month or so prior to the hearing, he stated that he had needed to use a wheel chair. Id. at 44.

Plaintiff testified that he last worked as a machine operator in a factory which manufactured belts. AR 47. He also drove a small truck for about one year. Id. at 53. Neither his factory job nor his job as a truck driver required lifting, but his factory job required him to stand all day. Id. He testified that he was unsure when he stopped working. Id. He attributed his inability to work to his physical problems, in particular his heart trouble and dizziness, as well as to stress and forgetfulness. Id. at 47-48.

Vocational Expert ("VE") Jose Chaparro also testified. He describe plaintiff's past work as a light truck driver and tractor operator, both of which were defined by the Department of

Transportation as medium work and semi-skilled. AR 57. The VE testified that Plaintiff also worked as a leather belt maker in the past, which was considered light work and semi-skilled. Id.

The ALJ put three hypotheticals to the VE. Under the first hypothetical, wherein Plaintiff had "severe" impairments but retained the RFC to lift and carry 100 pounds occasionally and 50 pounds frequently, retained the ability to stand and walk for six hours in an eight hour day, with a limitation to perform simple, repetitive task and maintain attention, concentration and pace, the VE opined Plaintiff could not perform his past relevant work but could perform other work in the national economy, including the jobs of "poultry offal," commercial or institutional cleaner and termite exterminator helper. Id. at 57-58.

Under the second hypothetical, Plaintiff was restricted to the ability to lift and carry only 20 pounds occasionally and 10 pounds frequently. Id. at 58. Under that scenario the VE opined Plaintiff could not perform his past-relevant work but still retained the ability to perform other work in the national economy such as housekeeping cleaner, bottling line attendant and agricultural produce sorter. Id. at 58-59. Finally, under a third hypothetical essentially using Plaintiff's description of his limitations, the VE opined that Plaintiff could perform no work at all. AR at 59.

Medical Record

Records from the Good Neighbor Clinic show Plaintiff received treatment for complaints of dizziness, coughing and frequent BM in July, 2003. AR 197. In follow-up exams in August, Plaintiff also complained of intermittent headaches and dizziness, as well as trouble breathing at night. Id. at 191, 194. He was assessed with among other things, diabetes, high blood pressure, gastritis, hepatitis A and B, obesity and asthma. Id. at 192, 194, 198. Plaintiff was prescribed numerous medications for treatment. Id.

Between April 2004 and October 2005, Plaintiff was treated on several occasions by Dr. Tuan Luu. AR 205-15, 224-32. Dr. Luu noted mildly elevated cholesterol but abnormal triglyceride and HDL levels. Id. at 213-14. Dr. Luu diagnosed Plaintiff as a "high" risk for coronary heart disease. Id. at 213. In several follow-up examinations Plaintiff indicated that he felt fine, except for intermittent headaches. Id. at 210, 224, 225, 229. At other examinations, Plaintiff complained of feeling thirsty, sleepy and dizzy and complained also of suffering back pain. Id. at 206, 208, 232.

4

1  Dr. Luu reiterated his findings of elevated triglycerides and HDL and noted high glucose levels. Id.
2  at 230-31.
3       In April 2005, opthalmologist Dr. Gary Waters treated Plaintiff. AR 216-20. Dr. Waters
4  noted vision impairment of 20/100 and 20/50 in Plaintiff's eyes but no significant visual field deficit.
5  Id. at 216. He indicated that Plaintiff "only needs glasses" and opined that with them he could
6  achieve 20/25 corrected vision. Id.
7       In June 2005, Plaintiff underwent a psychiatric evaluation by psychiatrist Dr. Ekram Michiel.
8  AR 221-23. Dr. Michiel noted that Plaintiff complained of depression and also told him that he
9  sometimes believes dying is better than living. Id. at 221. Plaintiff also stated that he didn't like
10 being around people. Id. Dr. Michiel diagnosed depressive disorder, noted a history of blood
11 pressure and asthma and also noted that Plaintiff was stressed by his health problems. Id. at 223. He
12 determined Plaintiff had a Global Assessment Function ("GAF") score of 65.[3] Id. Dr. Michiel
13 opined that Plaintiff could maintain attention and concentration and was capable of carrying out one
14 or two-step simple job instructions as well as an extensive variety of technical and complex
15 instructions. Dr. Michiel believed that Plaintiff could relate and interact with co-workers,
16 supervisors and the public. Id.
17       In treatment notes between April and October 2005, Dr. Luu documented Plaintiff's
18 complaints of back pain and dizziness. AR 232. Tests noted a very high glucose level, normal
19 cholesterol (159) but abnormal triglyceride and HDL levels, both negative risk factors for heart
20 disease. Id. at 230-31. During specific follow-up exams in September and October 2005, Plaintiff
21 relayed that he felt "fine." Id. at 224-25.
22       In a "Disability Determination Rationale" filed by Dr. Glenn Ikawa on March 30, 2005, he
23 recounted Plaintiff's claims that he was bedridden due to his maladies and needed assistance bathing.
24 AR 259. However, he described Plaintiff's credibility as "partial," and in a handwritten note
25 reiterated that he "is not fully credible" because his "constricted fields [are] not valid with no

---

[3] As noted by Defendant the current Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"), categorizes an individual with a GAF of 65 as falling in the category of a person with some mild symptoms or some difficulty in social, occupational or school functioning, but also notes that such an individual functions pretty well. Id. at 34.

5

underlying pathology." AR 259-60.

Neurologist Dr. Darrell Sharbaugh, agreed with Dr. Ikawa's findings, including the diagnosis of diabetes, hypertension, poor vision, depression, insomnia, hepatitis and asthma. He also agreed that Plaintiff's credibility was only "partial." Id. at 262.

In a July 7, 2005, functional capacity assessment of Plaintiff's mental situation, Dr. Ikawa, though noting mild depressive disorder, nonetheless concluded Plaintiff could sustain simple repetitive tasks with adequate pace and persistence and could adapt and relate to co-workers, supervisors and the public. AR 253. In particular, Dr. Ikawa found only mild to moderate restrictions on daily living, mild difficulty in social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation. Id. at 247.

Beginning in January 2006, Plaintiff was treated for decreased vision in his right eye on several occasions by Dr. Param S. Fagoora. Dr. Fagoora diagnosed amblyopia in Plaintiff's right eye. AR 431. In May 2006, Dr. Fagoora noted impairments to Plaintiff's depth perception which restricted his ability to work around heights, dangerous equipment or moving equipment, his ability to manipulate large objects at close distances and do work requiring distance vision in excess of 10 feet. AR 263. Although Dr. Fagoora opined that Plaintiff should "initially" avoid work involving depth perception, he further opined he could again perform such work "as he learns to use mono-vision for depth perception." Id. at 264.

Dr. Maximo Parayno, a psychiatrist and neurologist, reported that he treated Plaintiff between April 2005 and May 2006. AR 265. In a May 2006 report, Dr. Parayno noted that Plaintiff suffered a depressed mood, impaired sleep and appetite, impaired memory, concentration, attention span and forgetfulness, suicidal thoughts, feelings of hopelessness and worthlessness, high blood pressure, high blood sugar and exogenous obesity. Id. He diagnosed Plaintiff as suffering from PTSD, depressive disorder, recurrent hypertension, non-insulin dependent diabetes and obesity and prescribed several medications for treatment. Id. He characterized Plaintiff's prognosis as "guarded" and found his ability to follow work rules, relate to co-workers, supervisors and the public, use judgment, deal with stress, function independently and maintain attention/concentration to be "poor." Id. at 265-66.

Dr. Parayno opined that Plaintiff's poorly controlled diabetes and hypertension have caused cognitive impairment in his brain, in particular, with his ability to process both new and old information. Id. As a result of his maladies, Dr. Parayno concluded that Plaintiff could not execute work procedures that consist of 3-4 steps, that his "short temper" and that poor impulse control impaired his ability to relate to co-workers, supervisors and the public. Id. at 266. He concluded that, due to his "multiple somatic problems," Plaintiff could not handle the stress and pressure of a full-time job. Id.

Dr. Timothy Atamajian was Plaintiff's treating, general practitioner. In March 2007, Dr. Atamajian completed a questionnaire stating his opinion that, based upon his multiple evaluations of Plaintiff, Plaintiff's hypertension, asthma and depression precluded him from any full-time work, including work defined by the Social Security Administration as sedentary or light. AR 275. Dr. Atamajian found also that Plaintiff could sit for only 15 minutes at a time, walk or stand for only 15 minutes at a time during an 8-hour day and would need to lie down and elevate his feet during that same 8-hour day. Id. He stated that Plaintiff had been in this condition since January 2007. Id.

In October and November 2006, Plaintiff was treated by Dr. George Mednik. Dr. Mednik noted that Plaintiff appeared to have an enlarged liver. AR 423. However, an x-ray of Plaintiff's intestinal tract revealed no abnormalities other than a "more than moderate amount" of gas and debris. Id. at 423-24. X-rays of the lumber spine, right hip and right knee revealed mild degenerative changes. Id. at 416-18.

In early January 2007, Plaintiff underwent a cardiac catheterization after he reported to a hospital, complaining of chest pains and shortness of breath. AR 401-03. The catheterization revealed severe blockage in Plaintiff's right coronary and left anterior descending arteries. Id. at 401. As a result, Dr. Harcharn Chann performed a stent procedure on Plaintiff . Id. at 398. On March 15, 2007, Plaintiff was again admitted to the hospital after complaining of chest pain and shortness of breath. Three nitroglycerin pills relieved his pain. A subsequent EKG was normal. *Id*. at 320. Plaintiff was diagnosed with angina pectoris, coronary artery disease - post-stent, hypertension and diabetes and it was noted he needed treatment for angina. Id. Dr. Chann performed another catheterization and noted that due to the stenting, his right coronary and left anterior descending

arteries were "widely patent" with "mild diffuse irregularity." Id. at 282. Plaintiff was asymptomatic at his discharge on March 17, 2007. Id. at 277.

On March 22, 2007, Dr. Chann reiterated that the arteries that were stented seemed "okay" but also noted Plaintiff had an abnormal "metabolic profile" and that there was a possible need for treatment for sleep apnea. AR 425. He found Plaintiff's cardiac prognosis dependent on how well his lipids were controlled. Id.

ALJ Findings

The ALJ evaluated Plaintiff pursuant to the customary 5-step sequential evaluation. The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since his claimed onset date (May 1, 2002). AR 16. Second, he determined that Plaintiff had the following "severe" impairments: (1) depression disorder; (2) coronary heart disease; and (3) mild degenerative changes to his lumbar spine, right hip and right knee. Id. At Step Three, the ALJ determined that these impairments, neither separately nor in combination, met or medically equaled the requirements under the Agency guidelines for presumed disability. Id. at 19.

Next, the ALJ determined that, based on the medical record, Plaintiff retained the Residual Functional Capacity ("RFC") to: (1) lift or carry more than 20 pounds occasionally or 10 pounds frequently; and (2) frequently stand and/or walk for more than six hours in and eight hour day. AR 20. In addition, the ALJ found that Plaintiff retained the ability to maintain persistence and pace and the attention and concentration sufficiently to perform simple, repetitive tasks and to adapt to usual changes in the workplace, as well as the ability to adhere to workplace safety rules and relate to and interact with co-workers, supervisors and the public. Id.

Applying this RFC and considering the testimony of Vocational Expert Jose Chaparro ("VE") at the hearing, the ALJ determined that Plaintiff was unable to perform his past relevant work (Step 4). Id. at 23. However, he concluded at Step 5, that Plaintiff's RFC permitted him to perform a wide range of "light work" within the meaning of the Agency guidelines and, therefore, he was not disabled within the meaning of the Act. Id. at 20. In making this determination, the ALJ concluded that Plaintiff's description of his symptoms and limitations was not fully credible. Id. at 21.

///

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See* Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R.

§§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[4]  Applying this process in this case, the ALJ found that Plaintiff: (1) has not engaged in substantial gainful activity since the alleged onset of his disability; (2) has a medically determinable and severe physical impairment (degenerative arthritis of the lumbar spine); (3) does not have an impairment which meets or is equal to one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past work as either a light truck operator, tractor operator or leather belt maker as those jobs are performed in the national economy; but (5) retains the RFC to perform a wide range of light work that is simple and repetitive in nature except for work that involves lifting more than 20 pounds occasionally and 10 pounds frequently and sitting, standing or walking for more than about six hours in an eight-hour day. AR at 16-20.  The ALJ then determined that Plaintiff was not under a "disability" as defined in the Act. Id. at 25.

Plaintiff challenges the ALJ's determination at Step 5 of the sequential evaluation process, where an individual's ability to perform other work is assessed based on his RFC.  Plaintiff raises several claims of error.  First, he alleges the ALJ was biased and should have recused himself.  Second, he contends the ALJ erred in his RFC assessment.  Third, he argues the ALJ failed to properly assess the testimony and documentary evidence in the record.  In particular, he contends the ALJ discounted his symptom testimony without providing clear and convincing reasons.  Finally, he asserts the ALJ should have re-contacted certain examining doctors and failed to properly assess and credit the opinions of treating physicians.

## DISCUSSION

### A.  Plaintiff has Failed to Establish Bias by the ALJ

Plaintiff contends that ALJ Berry was biased which necessitates remand for a rehearing. (Doc. 19 at 7.)  Without citation to any evidence, he argues that ALJ Berry denied claims at a higher than normal rate.  More particularly, he contends that bias exists by him toward Plaintiff's counsel, Jeffrey Milam, that requires recusal. (Id.)  In particular, he cites a previous court action, Hixon v. Astrue, 1:06-cv-0353 (E.D. Cal. Sept. 14, 2007),  reversing benefits, in which the court specifically

---

[4] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

determined that, based on a series of disputes and contentions between ALJ Berry and Milam over the course of *that* case, that ALJ Berry was biased against Milam and should have recused himself from that case. Despite this order, Plaintiff contends ALJ Berry continued to hear cases involving Milam and also asserts that he "immediately denied all cases from the [Milam law] office for over a year . . . in retaliation for the [Hixon] Order." (Id. at 8.)

Defendant contends that in Hixon the record revealed "specific exchanges" between ALJ Berry and Milam that were "objectively contentious." (Doc. 20 at 7.) In addition, he notes that unlike this case, Milam specifically asked ALJ Berry to recuse himself. (Id.) Defendant argues that the record in this case is devoid of such contention and notes that the order in Hixon relied upon by Plaintiff was issued after ALJ Berry's decision in this case and thus, could not have provided a basis for retaliation against Milam by ALJ Berry. (Id. at 7-8.)

ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased. Schweiker v. McClure, 456 U.S. 188, 195 (1982). "This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Id. The burden of making such a showing rests with the party asserting bias. Id. at 196. To establish bias, Plaintiff must show "that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render a fair judgment." Rollins v. Massanari, 261 F.3d 853, 858 (citing Liteky v. United States, 510 U.S. 540, 555-56 (1994)).

Plaintiff's arguments rest on the disputes that occurred in Hixon. The Court has reviewed the decision in that case, passages of which are quoted by Plaintiff in his brief and agrees that much dispute and contention occurred between ALJ Berry and Milam over the course of that case. However, the Hixon court's determination of bias was predicated solely on conduct occurring in that case.[5] Although the examples of dispute were clear and the court's finding that ALJ Berry was biased was exhaustively catalogued by a rendition of numerous disputes between ALJ Berry and Milam during the course of those proceedings, the Court does not believe that the findings in that

---

[5] Plaintiff intimates bias by ALJ Berry in other cases involving Milam but provides no specifics beyond conclusory assertions and the claim that his percentage of denial of disability claims is higher than the average. (See Doc. 19 at 8.) Such vague, undocumented assertions cannot support a claim of bias.

11

case, without more, warrant remand in this case.

Unlike Hixon, the record in this case is devoid of any disputes, bitter exchanges or unprofessional conduct. In fact, Plaintiff has pointed to nothing in the record indicating overt or actual bias by ALJ Berry toward Milam, let alone Plaintiff. Nor has Plaintiff pointed to anything in ALJ Berry's demeanor or conduct throughout this case indicating he was unable to render fair judgment. In addition, unlike Hixon, the record is devoid of any indication that Plaintiff sought ALJ Berry's recusal at any point in these proceedings. In light of Plaintiff's inability to identify any actual bias displayed by ALJ Berry toward either him or attorney Milam during the course of these proceedings, the Court does not believe that evidence of disputes between Milam and ALJ Berry in the Hixon case warrant a finding of bias in this case that would render ALJ Berry incapable of making a fair judgment. In fact, in Rollins, the court required a showing of bias within the whole of the case at issue. Id., 261 F.3d at 858; see also Bayliss v. Barnhart, 427 F.3d 1211, 1214-15 (9th Cir. 2005) (holding that to succeed on a bias claim, a claimant "must show that 'the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment'"). In light of the fact that Hixon came out after proceedings concluded in this case and the fact that this case is devoid of any such disputatious conduct and, notably, the lack of requests for recusal, the Court concludes that Plaintiff has not met the heavy burden of establishing actual bias.

### B. The ALJ Properly Assessed Plaintiff's RFC, Evaluated Testimony and the Record and Properly Discounted the Opinions of Treating Physicians

Plaintiff raises several substantive objections to the ALJ's determination that he was not disabled. First, he contends that the ALJ failed to make a proper RFC assessment and failed to support his determination with substantial evidence. In addition, he contends that the ALJ failed to properly evaluate testimony and documentary evidence in the record and failed to properly review and credit the opinions of treating physicians.

Relative to Plaintiff's mental condition, the ALJ found that, although Plaintiff's depressive disorder was "severe" under the guidelines, evidence from an examining psychiatrist, Dr. Michiel, as well as records from two consulting experts, Drs. Sharbaugh and Ikawa, did not preclude work. See AR 221-23, 251-53, 261-62. Citing these experts, the Court discounted the evidence of a treating

physician, Dr. Parayno, who concluded that Petitioner's mental situation rendered him unable to perform full-time work. Id. at 266.

As a threshold matter, the ALJ noted that although Dr. Parayno claimed he treated Plaintiff for more than one year, the record only established one examination shown by a report filed in May 2006. See AR 265-68. No other documentation supporting an ongoing treatment relationship is presented in the medical record. Nevertheless, assuming Dr. Parayno was a "treating" physician, such an opinion is afforded greater weight, but it is not binding on the ALJ with respect to the ultimate determination of disability. Batson v. Commissioner, 359 F.3d 1190, 1194-95 (9th Cir. 2004). If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may discount that opinion by providing specific and legitimate reasons that are supported by substantial evidence. Bayliss, 427 F.3d at 1216; Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

In his June 2005 report, Dr. Michiel expressly diagnosed depressive disorder, and found a GAF score of 65, but determined that Plaintiff was able to "maintain attention and concentration and . . . carry out one or two step simple job instructions." AR 223. Dr. Michiel further opined that Plaintiff's mental condition did not preclude him from relating and interacting with co-workers, supervisors and the general public. In making this assessment, Dr. Michiel noted that his examination revealed that Plaintiff's thought processes were goal-oriented and not delusional. Id. He further supported his findings by conducting simple tests of Plaintiff's intellectual functioning, abstract thinking and insight and judgment. Id. at 222. Likewise, consultative experts, Drs. Sharbaugh and Ikawa, each concluded, based on their assessment of the medical records, that Plaintiff's depressive disorder did not preclude sustaining simple, repetitive tasks with adequate pace and persistence or from functioning with co-workers, supervisors or the public. Id. at 253, 260.

Based on the reports of Dr. Michiel and the consultative experts, the ALJ's determination to discount Dr. Parayno's findings were predicated on specific and legitimate reasons and substantial evidence in the record. See Batson, 359 F.3d at 1195 (ALJ reasonably discounted opinions of two treating physicians based, in part, on the results and findings of an independent consultative examiner). While the opinions of non-examining experts, such as Drs. Ikawa and Sharbaugh,

1  without more, are insufficient to contradict the opinion of a treating physician, when combined with
2  Dr. Michiel's findings, they may constitute substantial evidence and support a finding of not
3  disabled.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  Therefore, the ALJ's discounting
4  of Dr. Parayno's opinion was not improper under the circumstances, and his conclusion that
5  Plaintiff's depressive disorder did not prevent him from performing light work under the Agency
6  guidelines is supported by substantial evidence in the record.[6,7]

7        The ALJ's additional determination that Plaintiff's physical problems did not prevent light
8  work in the national economy was based also on substantial evidence in the record.  Plaintiff argues
9  that the ALJ improperly discounted evidence of serious coronary artery disease and failed to consider
10 it in his RFC assessment.  Review of the record indicates otherwise.   Plaintiff's heart disease did not
11 become apparent until January 2007.  At that point, it was determined that Plaintiff had significant
12 blockage in his right coronary and left anterior descending arteries and this was treated by a surgical
13 procedure implanting stents in two coronary arteries.  See AR 22, 400-02.  Although he returned to
14 the hospital with more chest pain and shortness of breath in March 2007,  a new catheterization
15 indicated that the stents were in place, and the cardiologist noted they were "widely patent," and
16 Plaintiff was treated with nitroglycerin and released asymptomatic.  AR 277, 282.  At an examination
17 later that month, the cardiologist reiterated that the stented areas seemed "okay."

18       Although Dr. Atamajian concluded in a questionnaire dated March 16, 2007, that Plaintiff
19 couldn't do full-time work due to his maladies, including his heart disease, the ALJ has articulated

---

[6] Plaintiff also cites the opinion of his treating general practitioner, Dr. Atamajian, that he could not work due, in part, to his mental condition.  See AR 275.  However, there is no evidence that Dr. Atamajian is a mental health expert and provided no basis to support this conclusion.  It is not clear if his opinion was based on his own findings, which are not outlined, or whether he was repeating the opinion of Dr. Parayno.  Under these circumstances, the ALJ's discounting of Dr. Atamajian's opinion on this point was not improper.  See Batson, 359 F.3d at 1195 (rejecting treating physician's conclusory findings); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (the ALJ need not accept a treating physician's opinion which "is brief and conclusory in form with little in the way of clinical findings to support [its] conclusion.")

[7] Under the RFC adopted by the ALJ, to wit: Plaintiff retained the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit, stand or walk for up to six hours in an eight hour day, and the additional findings that Plaintiff retained the ability to maintain persistence, pace and attention and concentration sufficient to perform simple repetitive tasks, and could adapt to usual changes at the workplace and adhere to safety rules, the VE opined that Plaintiff could perform other work in the national economy.  AR at 58; see 20 C.F.R. s 404.1567(b); SSR 83-10.

specific and legitimate reasons for discounting this opinion. As noted, Dr. Atamajian opined that Plaintiff had been disabled only since January 2007, the onset of his apparent heart problems. The ALJ reasonably determined that this opinion was, thus, of rather limited weight because, in addition to offering no opinion on whether this disability could be expected to last 12 months, the opinion was of scant support for Plaintiff's overarching claim of a disability onset date of May 1, 2002, and a date last insured of March 31, 2004. Morgan v. Sullivan, 945 F.2d 1079, 1080 (9th Cir. 1991) (to establish disability Plaintiff must show he was disabled prior to his last insured date). In light of the evidence from the treating cardiologist that the stent procedures were successful and that Plaintiff seemed asymptomatic after treatment in March 2007, the ALJ's determination that his heart disease was not sufficiently severe to prevent light work under the Agency guidelines was supported by substantial evidence in the record. In addition, in fashioning his RFC assessment, the ALJ specifically stated that he considered Plaintiff's coronary artery disease in concluding that Plaintiff was limited to no more than light work under the Agency guidelines. AR at 22-23.

Likewise, Plaintiff has pointed to nothing in the record from any professional indicating that his mild degenerative changes to his lumbar spine, right hip and right knee prevent him from performing light work. See Magallanes, 881 F.2d at 751. Under these circumstances the ALJ's determination that Plaintiff's severe physical problems, including his heart disease, did not render him disabled was supported by substantial evidence in the record. In reaching this conclusion the ALJ has articulated specific and legitimate reasons for discounting the opinion of his treating physician, Dr. Atamajian.

Similarly, the ALJ cited specific and legitimate reasons for discounting the opinion of a treating eye specialist, Dr. Fagoora. Dr. Fagoora began treating Plaintiff in January 2006, and determined that he had "amblyopia" in his right eye which prevented him from performing tasks involving depth perception. AR 426-31, 264. However, in an examination performed in April 2005, Dr. Gary Waters indicated that although Plaintiff had poor vision in his right eye (20/100), he only needed glasses to correct his vision to a near normal 20/25. Id. at 216. In addition, a review of Dr. Fagoora's notes reveals that although he found that Plaintiff had decreased vision in his right eye that impinged his depth perception to the point that he should avoid tasks involving depth perception, he

intimated that such a restriction was not permanent and that Plaintiff may again perform tasks involving depth perception once he learns to use mono-vision. AR 264. Thus, Dr. Fagoora's findings are not inconsistent with the ALJ's conclusion that his vision was not a permanent, non-exertional factor which significantly impacted his ability to perform light work under the guidelines.

Plaintiff also challenges the ALJ's conclusion that Plaintiff's symptom testimony was less than fully credible. At the hearing, Plaintiff testified that his symptoms had required him to use a cane to walk for the past two years, and that since the period 2005-2006 his physical problems had prevented him from sitting for more than 1-2 hours at a time and standing for more than 10 minutes at a time. AR 49-50. Once a plaintiff who alleges disability based on subjective symptoms presents objective medical evidence of an impairment, which could reasonably be expected to cause the claimed symptoms, absent malingering the ALJ may reject such testimony only by offering specific, clear and convincing reasons for doing so. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996).

Here, the ALJ noted that the medical evidence is devoid of any indication that a cane used by Plaintiff was prescribed by a doctor. The ALJ also noted that Plaintiff's claimed symptomology was inconsistent with the objective medical evidence, citing x-rays showing only mild degenerative changes to his back, right hip and right knee, no indication of patent heart disease before 2007 (which doctors treated and found controlled), and depressive disorder which several experts stated did not prevent Plaintiff from performing simple tasks and functioning adequately with coworkers, supervisors and the public. Although Plaintiff had been assigned a wheelchair in March 2007, a month before the Agency hearing, there is nothing in the record explaining the necessity for it or indicating whether this was likely to be a permanent need. In light of these facts, Plaintiff has failed to establish that the objective medical evidence supports his claimed symptomology as of the alleged onset date or as of the date he was last insured.

Finally, Plaintiff contends that the ALJ erred in not seeking further medical records and erred in discounting lay testimony from Plaintiff's son concerning Plaintiff's functional capacity. For the reasons outlined above, the testimony of Plaintiff's son was that Plaintiff was almost completely unable to function physically, was properly discounted as "grossly" inconsistent with the medical evidence in light of Plaintiff's impairments. See AR 21, 138-46.

On the other hand, the evidence indicates that the ALJ exhaustively addressed all of Plaintiff's claimed maladies. He explained why he believed the record did not support a finding that Plaintiff could not work despite his depression, heart disease and back, hip and knee impairments. AR 22-23. In addition, the ALJ also explained in detail why Plaintiff's other alleged problems were not severe within the meaning of the guidelines. Id. at 17-19. Finally, the Court notes that when the medical reports and opinions are in conflict, it is the ALJ's duty to resolve the conflicts. See Morgan v. Commissioner, 169 F.3d 595, 601 (9th Cir. 1999). Review of Plaintiff's argument indicates he simply disagrees with the ALJ's resolution of conflicts in the evidence.

## **CONCLUSION**

For the reasons discussed, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.

Accordingly, this Court RECOMMENDS:

1. Plaintiff's Social Security complaint BE DENIED, and;

2. That Judgment be entered for Defendant Michael J. Astrue and against Plaintiff Sue K. Yang.

These Findings and Recommendations are submitted to the United States District Judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. No later than fourteen days (14) after service of these Findings and Recommendations, any party may file written objections to these Findings and Recommendations with the Court and serve a copy on all parties and the Magistrate Judge and otherwise in compliance with this Court's Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Responses to objections shall be filed and served no later than seven (7) days after filing of the objections and otherwise in compliance with this Court's Local Rule 304(d). A copy of these responses shall be served on the Magistrate Judge. The District Judge will review the Findings and Recommendations, pursuant to 28 U.S.C. § 636(b)(1). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Judge's

order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **February 8, 2010**                                         **/s/ Jennifer L. Thurston**
                                                                            UNITED STATES MAGISTRATE JUDGE